[No. 1794]

GOLDFIELD–MOHAWK MINING COMPANY, APPEL-
LANT, v. THE FRANCES–MOHAWK MINING AND
LEASING COMPANY, ET AL., RESPONDENTS, AND D.
MACKENZIE & COMPANY, RESPONDENTS.

1. APPEAL AND ERROR—STATEMENT—SERVICE.
    Where in the minutes of the trial court there appeared an entry,
    "motion to release the attachment will be granted upon giving a suf-
    ficient bond," and the order of the judge releasing the attachment was
    dated several days before it was filed, plaintiff, appealing from the
    release, had within twenty days after the filing to serve his statement.

2. APPEAL AND ERROR—STATEMENT—FILING.
    Where the only amendment to a statement was one added by
    stipulation, stating that on a certain date the court overruled defend-
    ant's application to dissolve an attachment, a contention that the
    appeal from an order discharging the attachment should be dismissed
    because the statement was not filed after the addition of the amend-
    ment was of no merit, the parties having stipulated that "the fore-
    going statement, * * * and the amendments thereto proposed, are
    agreed upon as setting forth a correct record, and that the same be
    certified by the clerk," and that defendant did not waive any right to
    insist that the statement was not originally filed within the time
    required.

3. ATTACHMENT—RELEASE—SURETIES—"HOUSEHOLDER."
    One keeping house with a hired servant, doing the cooking and
    housework for him in a house in which he made his home and resi-
    dence, and which he rented from a corporation bearing his name, in
    which he owned a majority of the stock and controlling interest, was
    a "householder" within the statute, so as to qualify him as a surety
    on a bond for the discharge of an attachment.

4. ATTACHMENT—BOND—RELEASE—SURETIES.
    One whose rights depended on a quitclaim deed and possession,
    and who was not shown to have secured the government title, was
    none the less a freeholder so as to qualify him as a surety on a bond
    for the discharge of an attachment.

5. ATTACHMENT—RELEASE.
    An objection that the trial court should not have granted a motion
    for the discharge of an attachment because another motion to dissolve
    the attachment was pending and undetermined was of no merit; the
    earlier motion having been denied before or at the time that the later
    one was granted.

6. ATTACHMENT—DISCHARGE.
    The statute, providing that, whenever the defendant shall have
    appeared in the action, he may apply for an order to discharge the
    attachment, does not mean that the defendant can apply for the dis-
    charge only at the time he appears, and no later.

7. Attachment—Discharge—Sureties.

>The fact that the property of the sureties on a bond for the discharge of an attachment issued against a corporation consisted of stock of defendant did not disqualify them.

8. Garnishment—Quashing or Vacating—Grounds.

>Where an attachment was issued, and moneys of defendant on deposit in a bank were garnished, and thereafter the money in excess of plaintiff's claim was released by a stipulation, which recited that the attachment was levied, defendant could not be heard to say that there was no legal attachment because no garnishment notice was served on the bank.

9. Garnishment — Discharge on Security — Property Which May Be Released.

>The statute (section 132 of the practice act; Comp. Laws, 3227) provides that the sheriff shall make a full inventory of the property attached, and that to enable him to make returns as to debts and credits attached, he shall request the party owing the debt, etc., to give him a memorandum of the same. Section 139 (Comp. Laws, 3234) provides that defendant may apply for an order to discharge the attachment upon the filing of a bond, and that an order may be made releasing the property debts or credits attached. *Held*, that a contention that in giving an undertaking only property in the hands of the sheriff could be released, and not property in a bank which had been garnished, was of no merit.

Appeal from the District Court of the First Judicial District of the State of Nevada, Esmeralda County; *F. P. Langan*, Judge.

Action by the Goldfield-Mohawk Mining Company against the Frances-Mohawk Mining and Leasing Company and others, and another action by the same plaintiff against D. Mackenzie & Co. From an order in each case discharging an attachment, plaintiff appeals. **Affirmed.**

The facts sufficiently appear in the opinion.

*Thomas, Bryant & Malburn* and *Thomas & Bryant*, for Appellant.

*R. G. Withers* and *H. M. Farnam*, for Respondents.

By the Court, Talbot, J.:

Both of these actions were brought to recover damages alleged to have resulted from caving, caused by the improper working by the defendants of mining ground, in violation of

the terms of the lease given to the defendants' assignors by plaintiff. The legal questions involved are similar in both cases, and have been argued and submitted together. Attachments for the amounts claimed, respectively, $100,000 and $25,000, were issued and levied, and moneys of the defendants on deposit in bank, about $250,000 belonging to D. Mackenzie & Co., and about $750,000 belonging to the Frances-Mohawk Mining and Leasing Company, were garnished. Thereafter the money levied upon in excess of the amounts claimed was released by the stipulation of the parties, in which "the right of the defendants to apply to the court for a discharge or a release of the attachment" was expressly reserved. The defendants moved to dissolve the attachments, on the ground that they had not been legally issued, and later they moved to have them discharged by proffering an undertaking. These motions were resisted by the plaintiff and withdrawn by defendants, who filed new motions to discharge the attachments, and offered in the suit for $100,000 an undertaking upon which D. Mackenzie, Lillian E. Goodberlet, and L. Estelle Goodberlet became jointly and severally liable in the sum of $200,000, to which was attached the affidavit of Mackenzie that he was a resident and householder in Esmeralda County, Nevada, and worth more than that sum, and the affidavit of Lillian that she was a resident and freeholder in that county, and worth more than that amount, and the affidavit of Estelle that she was worth more than $10,000—exclusive of their debts and liabilities, and property exempt from execution. In the other case the same persons gave their joint and several undertakings in the sum of $50,000, with similar affidavits attached. Plaintiff required the justification of the sureties, and the court, after hearing their testimony, held that they were sufficient, that the undertakings were good, and ordered that the attachments be discharged, and the money remaining in the bank be paid to the defendants. From these orders the appeals are taken.

Respondents moved to dismiss the appeals, claiming, among other designated grounds, that the statements were not filed or served upon the defendants within twenty days after the

orders appealed from were entered by the district court, and that the statements have not been filed with the clerk. The controlling questions presented relate to the motions to dismiss, and to the sufficiency of the sureties, and these are the only ones needing extended consideration. The written order in each case, specifically discharging the attachment, and directing the release of the moneys from its operation, signed by the judge, is dated May 11th, and filed May 18th, one week later. The statements were served on June 6th, within twenty days of the latter date, but more than twenty days after the former. It is claimed that this service was too late, because the following entry appears in the minutes of the court: "Motion to dissolve the attachment is denied. The motion to release the attachment will be granted upon giving a good and sufficient bond. To apply in both cases." Assuming that, if an order had been made in open court and entered in the minutes on the 11th, directing the release of the attachments, it would have been valid and sufficient, and the time to take proceedings on appeal would have commenced to run from the date it was made, the minute entry does not indicate that any final order was made in open court, releasing the attachments or adjudging the undertaking or sureties sufficient, from which the plaintiff could have been expected to appeal. The statement that "the motion to release the attachment will be granted upon giving a good and sufficient bond" could hardly be construed as an order releasing the attachment, or as indicating that it would be released until the court took future action, and had passed judgment on the sufficiency of the sureties and approved the bond. Therefore we must conclude that the minute order did not require the service of a statement within twenty days, or any appeal, so far as the questions brought to this court, the sufficiency of the undertaking and sureties, are concerned. The written order of the judge, dated the 11th but not filed until the 18th of May, did not become effective until it was filed, and the appellant had until twenty days thereafter in which to serve the statement. (*Schultz* v. *Winter*, 7 Nev. 130.) Any other rule would jeopardize a party's rights, for the order might not be filed for more than twenty days after it had

been signed and dated, and the period within which the appellant would be allowed to serve his statement would have expired before he could obtain knowledge from the records of the court that the order had been made.

The only amendment to the statement was one added by stipulation, stating that on the 11th day of May, 1908, the court overruled the defendant's application to dissolve the attachment, on the claim that it had been illegally issued. Respondent contends that the appeal ought to be dismissed because the statement was not filed after the addition of this amendment.   When a statement is amended and changed in such material respects as to make it a new document, ordinarily it is filed as such, in addition to the previous filing of the proposed statement.   Here the parties stipulated that "the annexed and foregoing statement, on appeal from order discharging the attachment and releasing moneys attached, which was duly filed with the clerk of the court in the above-entitled cause on the 6th day of June, A. D. 1908, and the foregoing amendments thereto proposed by the defendant, and filed June 11, 1908, are true and correct, and are hereby agreed upon as setting forth a correct record of what transpired in said cause, and a correct statement on appeal of the same, and it is further stipulated and agreed that the same shall be certified by the clerk of the court as a settlement of the case upon appeal." The stipulation provided that the defendant did not "waive any right which the defendant might have to insist that said statement on appeal was not originally filed within the time allowed by law," but it did not make any other reservation.

The motion to dismiss the appeal is denied.

Upon the examination of the sureties D. Mackenzie testified: That he was a resident and householder in Goldfield, Esmeralda County; that he kept house there with one servant, who did the cooking and housekeeping for him; that his wife and boy were in Chicago; that his wife had refused to come to Goldfield and live there, but that he expected her to come before very long; that when he came to Goldfield, it was with the intention of making his residence, and that he maintained a household there for several years; that he owned

over 15,000 of the 25,000 shares of the stock of D. Mackenzie & Co.; that these shares were worth over $200,000, and that the company had about $500,000 in different banks; that of this money $250,000 were in the Crocker National Bank in San Francisco, $100,000 in the American National Bank in Los Angeles, and over $50,000 in local banks; that the company did not owe more than from $10,000 to $25,000; that it was incorporated under the laws of Arizona; that his stock was in his pocket, and had not been hypothecated, and that he had no debts; that in addition to these moneys on deposit the company owned real estate worth $75,000, of which $32,000 in value was in the county, including the house in which he lived, bank and mining stock, aggregating $1,297,-000; that a large proportion of these stocks were in companies operating in Goldfield.

Lillian E. Goodberlet, another surety, testified: That she was a resident and freeholder in the county, and owned a one-half interest in a house and lot, where she and L. Estelle Goodberlet, another surety, resided in Goldfield; that she acquired her interest from Estelle, and had a quitclaim deed from the Goldfield Town Site Company; that she did not know whether the title was still in the government of the United States; that she was worth more than $200,000, consisting principally of a quarter interest in D. Mackenzie & Co., which she had owned ever since the incorporation of the company; that she had this stock with her, and that she owned a large amount of stock in other companies, and an interest in an estate in St. Louis. She gave a list of the shares and values of the mining stocks which she said she owned, which were valued at $263,000.

L. Estelle Goodberlet testified: That she was a resident and freeholder in the county, and owned a one-half interest in a house and lot which she bought for a home, where she resided in Goldfield with Lillian E. Goodberlet; that she owned stocks worth more than $10,000, and houses and lots in St. Louis valued at $24,000.

The evidence offered is uncontradicted that the sureties are residents of Esmeralda County, and possessed of ample wealth to enable them to qualify. Technically, do they come within

the terms of the statute requiring them to be freeholders or householders?

Our conclusion, that keeping house with a hired servant doing the cooking and housework for him, in a house in which he made his home and residence, and which he rented from a corporation bearing his name, in which he owned a majority of the stock and controlling interest, constituted him a householder, finds support in the decisions.

In *Lester* v. *State*, 2 Tex. App. 448, the court said: "As used in the statute, the word 'householder,' though otherwise held, is, we take it, synonymous with 'housekeeper,' which is defined by Bouvier to be 'one who keeps house.' He further says: 'In order to make the party a housekeeper, he must be in actual possession of the house'—citing 1 Chitt: 288–316; 1 B. & C. 178; 2 T. R. 406; 1 Bott. 5; Bouv. L. Dic., tit. 'Housekeeper.' Mr. Burrill, in his law dictionary, defines a householder to be the occupier of a house."

In *Kamer* v. *Clatsop County*, 6 Or. 240: "Upon the second point it appears that several of the petitioners were unmarried men, who, in the language of the transcript, 'kept houses and servants.' We are of the opinion that they were householders."

In *Aaron* v. *State*, 37 Ala. 113: "'A person having and providing for a household, is a householder.' (*Griffin* v. *Sutherland*, 14 Barb. 456.) See, also, *Rex* v. *Inhabitants of Rufford*, 8 Mod. 40; *Slade's Bail*, 1 Chitty, 502; *Rex* v. *Poynder*, 1 B. & Cress. 178; 3 Petersdorff's Abr. 103. Householder, in our statute, means something more than the mere occupant of a room or house. It implies in its terms the idea of a domestic establishment—of the management of a household. (*Sallec* v. *Waters*, 17 Ala. 482; *Boykin* v. *Edwards*, 21 Ala. 261; *Parmele's Case*, 2 Mart. O. S. La. 313.)"

In *Kelley* v. *McFadden*, 80 Ind. 536, it was held that one without a wife, child, or other dependent, who, with a hired servant, occupies a house and maintains a household, is a householder within the meaning of law.

In *Lane* v. *State*, 29 Tex. App. 319, 15 S. W. 829: "It implies the idea of a domestic establishment—the management of a household. It is not requisite that the person

should be a married man.  His family may consist of servants or others occupying the house with him, but he must be the head or master of the establishment.  (9 Am. & Eng. Ency. Law, p. 783, note, 1; Thomp. on Trials, sec. 53.)"

The other sureties were shown to be freeholders.  Although their rights depended upon a quitclaim deed and possession, and it was not shown that the government title had passed to them, it was not necessary that they hold the patent from the government.  Ownership of a large part of the town and agricultural property in this state has rested on possession for a generation.  In many localities the land has not yet been surveyed, so that patent could be secured.  This court and the Supreme Court of the United States have held that possession gives a right which may be conveyed, and which is complete against every one excepting the United States.  Courts are not inclined to try the collateral question of superior title in determining whether a person is a freeholder.

In *Shively* v. *Lankford*, 174 Mo. 548, 74 S. W. 838, the court stated: "That one may be a freeholder, and not a householder, or a householder and not a freeholder, seems to be too plain for argument.  'Householder' refers to the civil status of a person, not his property, and a man may be a householder without owning real estate, or any interest therein, whereas a freeholder is one who owns 'a freehold estate; that is, an estate in lands, tenements, or hereditaments of an indeterminate duration, other than an estate at will or by sufferance, as in fee simple, fee tail, or for life, or *durante viduitate*, or during coverture,' etc.  (2 Minor's Inst. 71, 1c; 1 Thos. Co. Lit., 621 and note c.)"

A definition substantially the same is given in *Cummings* v. *Hyatt*, 54 Neb. 38, 74 N. W. 411, to the term "freeholder."

In *Harlan* v. *State*, 136 Ala. 154, 33 South. 858, a man who resided on a lot, which formerly belonged to his deceased wife, who died intestate, and in which the statute gave him an interest, was held to be a freeholder.

In *Exendine* v. *Morris*, 8 Mo. App. 388, the court said: "One in possession of land, claiming to own it, and commonly reputed as owning it in fee, would be a freeholder within the meaning of any statute requiring a freehold qualification in an

appraiser of land for an administrator's or guardian's sale, independently of any question as to the validity or record sufficiency of his title. It cannot be necessary to go into record evidence of title to show such a qualification. There may be no record evidence."

We find no error in the conclusions of the district judge that the sureties met with the requirements of the statute, and were possessed of ample means to protect the appellant in the payment of any judgment which it may recover.

A number of propositions advanced and cases cited in the briefs, which cover over a hundred pages, are not deemed to apply to the conditions prevailing here.

It is claimed that the court should not have heard or granted the motion from which the appeal is taken, because another motion to discharge the attachment was pending and undetermined. But the earlier motion was denied before or at the same time that the latter one was granted, and we do not consider that the prior motion to dissolve the attachment, on the ground that it was illegally issued, was in conflict with the one to discharge the attachment upon giving an undertaking.

It is argued that, under the language of the statute that "whenever the defendant shall have appeared in the action, he may apply, upon reasonable notice to the plaintiff, to the court in which the action is pending or to the judge thereof, for an order to discharge the attachment," the defendant could apply for the discharge only at the time he appeared, and no later. It will be observed that the statute does not state that when the defendant appears, or whenever he appears, he may apply for a discharge, but whenever he shall have appeared in the action, which is equivalent to stating at any time after he appears.

It is also urged that the court had no authority to make the order, because the money had passed out of the control of the court, and into the hands of the bank as trustee. It is indicated, in different paragraphs of the stipulation, that the parties contemplated and arranged for the release of the attachment on all moneys excepting the sum of $100,000 in one action, and $25,000 in the other, and they did not agree to

the release of the attachment on those amounts, and the stipulation definitely provided that the plaintiff would not hold under attachment more than those amounts, and expressly reserved to the defendants the right to apply to the court for the discharge or release of the attachment.  It is said that the property of the sureties consisted of stock of defendants, and that they had no property in the state which could be levied upon by execution.  The statute only requires that the sureties be residents and freeholders or householders in the county, and that they be worth the necessary amounts.  As the stockholders are in law individually distinct from the corporation itself, may they not become sureties if they qualify in compliance with the statute, and it appears, after the trial judge has heard the evidence, that their financial standing is such as to meet its requirements and protect the plaintiff? Here two of the sureties were officers of one of the companies which carried on their principal operations in the county, and they are uncontradicted in their testimony that they are residents of the county; and, although their property consists largely of stock in the company, if they are, nevertheless, worth the requisite amount, we see no reason why they may not act as sureties, and protect the plaintiff in any judgment it may obtain.  The assets of the defendants here are shown to be mostly cash on deposit in bank, which gave value to the corporate stock owned by the sureties; and, although the most of this is in foreign corporations, it is not a class of property which is exempt, so that it cannot be made to meet the obligations of the owners.

It is asserted that no legal attachment of the moneys was made because no garnishment notice was served upon the bank, but the terms of the stipulation reciting that the attachment was levied and providing for its release of part of the money, preclude the defendant from maintaining this position.  It is also urged that in giving of an undertaking only the property in the hands of the sheriff could be released from attachment, and cases are cited giving this construction to the language of the statute in Colorado.  We think it would be too harsh and unwarranted to so construe our practice act, which treats garnishment as an attachment of moneys and

credits, and makes no distinction as to the kind of property which may be released.    It is provided in section 132 (Comp. Laws, 3227): "The sheriff shall make a full inventory of the property attached, and return the same with the writ.    To enable him to make such returns as to debts and credits attached, he shall request at the time of service the party owing the debt, or having the credit, to give him a memorandum stating the amount and description of each. * * *" And in section 139 (Comp. Laws, 3234): "Whenever the defendant shall have appeared in the action, he may apply, upon reasonable notice to the plaintiff, to the court in which the action is pending, or to the judge thereof, for an order to discharge the attachment, wholly or in part, upon the execution and filing of the undertaking mentioned in the next section.    Such order may be granted directing the release from the operation of the attachment, upon the filing of such undertaking and the justification of the sureties thereon, if required by the plaintiff, or all or any part of the property, money, debts or credits attached, as the case may be. * * *"

The order from which the appeal is taken is affirmed in each case.